***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman, with modifications.
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the employee and employer on September 2, 1998, date of the alleged injury by accident.
3. The defendant was self insured with National Loss Control Services Corporation through Kemper Insurance Company as the servicing agent.
4. The proper rate of compensation is $360.24 per week.
5. Plaintiff received short-term disability benefits from an employer-funded plan for thirteen weeks at the rate of $250.00 per week.
6. The parties stipulated into evidence the following:
a. Letter from Mike Stevens dated May 25, 2001.
b. Packet of medical records and reports.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was thirty-six years old at the time of hearing before the Deputy Commissioner, began working for defendant in April 1998 as a local truck driver. Her job involved driving tractor-trailers between Greensboro and Winston-Salem to make deliveries. She would usually make six to eight runs per day. As part of her regular work duties, plaintiff connected and disconnected trailers from her truck multiple times each day.
2. On September 2, 1998, plaintiff reported for work with a stiff neck. She had hurt her neck and shoulder on August 24, 1998, when she stumbled and grabbed a rail while trying to avoid stepping on her dog. The physician's assistant at Club Haven Family Practice diagnosed plaintiff with cervical and rotator cuff strains and kept her out of work for the rest of the week. She returned to work on August 31. 1998. However, on September 1, 1998, plaintiff hurt herself again when her bed collapsed while she was watching television, causing her head to be pushed forward abruptly. Although her neck was stiff the next morning, plaintiff felt able to return to work and made a couple of tractor-trailer runs without incident before the injury giving rise to this claim occurred.
3. As plaintiff was disconnecting her fourth trailer on September 2, 1998, she had difficulty pulling out the pin to the fifth wheel. She pulled on it with all of her strength and suddenly experienced a stabbing pain in her neck with pain going down both arms. The pain was such that she dropped to her knees. After calling her employer to report the injury, plaintiff called her doctor's office and then her fiance, who picked her up and took her to the medical clinic. The physician's assistant examined her and treated her with medication for what appeared to be a severe strain. She had problems with the medication and on September 8, 1998, she reported to the emergency room where she described her last two injuries as well as subsequent exacerbation of pain while lifting a bag of dog food. Plaintiff complained of pain and numbness in both arms. The emergency room physician changed her medication.
4. Plaintiff subsequently returned to her doctor's office and was referred to Dr. Pikula, a neurosurgeon, since her symptoms were consistent with a ruptured disc. Dr. Pikula examined her on September 15, 1998. Although plaintiff described both injuries to Dr. Pikula, he was not familiar with fifth wheels and misunderstood what she told him about her injury at work. Her primary complaints that day were left arm pain and numbness, as well as neck pain. Dr. Pikula ordered an MRI, which revealed a right-sided ruptured disc at C5-6 and mild bulging of C6-7. Since the findings were on plaintiffs right side and her worse symptoms were on the left, the doctor recommended conservative treatment. However, plaintiff complained of right shoulder and scapular pain on October 12, when Dr. Pikula first saw her after the MRI. Despite medication, traction, physical therapy, and a cervical collar,
plaintiff's symptoms worsened. Dr. Pikula ordered a myelogram/CT scan, which revealed defects at both C5-6 and C6-7 with cord compression at the higher level. Consequently, he recommended surgery.
5. On November 17, 1998, plaintiff underwent surgery to decompress and fuse the interspaces at C5-6 and C6-7. Following the operation, her symptoms improved significantly. By the time of the follow-up visit on January 2, 1999, she only reported soreness in her neck and shoulders after removing her cervical collar. Consequently, Dr. Pikula released her to return to work on February 1, 1999, without restrictions. According to her testimony, plaintiff did not return to work at that time, but the evidence did not establish that her failure to return to work was due to her neck problem. She received treatment for depression from Club Haven Family Practice in February and March 1999 and described numerous socioeconomic stressors. Although plaintiff did describe some pain in her neck muscles on February 15, 1999, and was apparently sent to physical therapy, there was no note excusing her from work. She did not receive further treatment for neck problems until March 29, 1999, when she reported persistent neck pain and numbness in her fingers. By that time Dr. Pikula had retired, so her family doctor sent her to Dr. Brown, another neurosurgeon.
6. Dr. Brown evaluated plaintiff on May 5. 1999, for her complaints of neck pain and pain in both arms. At that time, plaintiff was pursuing a legal action against the bed manufacturer and she only told him about the incident of the bed collapsing. However, she described the treatment she had received and her worsening symptoms. Dr. Brown ordered an MRI which indicated that C6-7 had not fused satisfactorily. He advised her that her smoking habit had contributed to the problem and insisted that she quit smoking if she wanted him to perform further surgery. Plaintiff agreed, so on June 21, 1999, Dr. Brown re-explored both levels. He found that neither level had fused, so he repeated the fusion using her own bone for the bone graft plus a plate for further stability. Her neck and left arm pain resolved after the operation but she initially complained of worse right arm pain. By August plaintiffs arm pain was improved, but in October she had some recurrent neck pain and numbness in her right hand.
7. Dr. Brown continued to follow plaintiff's recovery. Plaintiff advised him of gradually increasing symptoms. As of June 2000 it appeared that C6-7 had fused adequately but that there was still a non-union at C5-6. The higher level had still not fused by September 13, 2000, when he last saw her and he did not think that further surgery would likely correct the problem. Consequently, Dr. Brown recommended that plaintiff tolerate the symptoms and return to him only if they became intolerable.
8. Defendant has denied this claim on the basis that the neck condition for which plaintiff was treated was not due to her injury at work but was due to the bed collapsing. It appears clear that plaintiff did have three neck injuries within a short period of time, including an injury at work which caused the most severe symptoms. She reported her injury at work immediately and sought medical treatment right away. Although there was some misunderstanding by the medical providers regarding what was involved in disconnecting her trailer, her histories were reasonably consistent during the first month. Although she did try to turn the focus towards the bed incident due to the lawsuit involved, it was the injury at work which caused her to seek medical treatment due to the severity of the symptoms associated with that final injury.
9. On September 2, 1998 plaintiff sustained a specific traumatic incident of the work assigned when she pulled forcefully on the fifth-wheel pin while disconnecting the trailer from her truck. As a result of the incident, she sustained an injury to her cervical spine, which aggravated preexisting degenerative and acute conditions and which led to the treatment she subsequently received. The surgery performed by Dr. Pikula was a proximate result of the injury at work and resulting symptoms. The treatment by Dr. Brown was a continuation of the previous compensable treatment.
10. As a result of the specific traumatic incident at work, plaintiff was unable to perform her job duties from September 3, 1998, through January 31, 1999, and from May 5, 1999, through September 13, 2000, when Dr. Brown last saw her. At that last office visit, he indicated that she would not be able to return to work due to intractable pain, the narcotic pain medicine prescribed, and the resulting problems with concentration. Consequently, she remained unable to work in any capacity until the date of hearing due to the injury giving rise to this claim.
11. The issue of maximum medical improvement was not addressed by the evidence.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On September 2, 1998, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant in that she sustained a back injury as the result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. The injury at work on September 2, 1998, was a proximate or aggravating cause of the cervical spine conditions for which plaintiff was subsequently treated. Click v. Pilot Freight Carriers, Inc.,300 N.C. 164 (1980).
3. Plaintiff is entitled to compensation for temporary total disability at the rate of $360.24 per week from September 3, 1998, through January 31, 1999, from May 5, 1999, through the date of hearing on January 11. 2002, and continuing thereafter until she returns to work or until further order of the Industrial Commission. However, this compensation is subject to a credit in favor of defendant for the thirteen weeks of disability benefits paid pursuant to an employer-paid disability plan. N.C. Gen. Stat. §§ 97-29 and 97-42.
4. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay compensation to plaintiff for temporary total disability at the rate of $360.24 per week from September 3, 1998, through January 31, 1999, from May 5, 1999, through the date the hearing on January 11, 2002, and continuing thereafter until she returns to work or until further order of the Industrial Commission. This award is subject to a credit in favor of defendant for the thirteen weeks of disability benefits previously paid. That portion of this compensation that has accrued shall be paid in a lump sum. This award is also subject to the attorney's fee hereinafter approved.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiffs counsel. Defendant shall pay counsel a lump sum from the accrued compensation and shall thereafter pay him every fourth check.
4. Defendant shall pay the costs.
This 20th day of December, 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER